KATHLEEN HADDEN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hadden v. Commissioner
Docket No. 4189-86
United States Tax Court
T.C. Memo 1990-578; 1990 Tax Ct. Memo LEXIS 648; 60 T.C.M. (CCH) 1206; T.C.M. (RIA) 90578; November 8, 1990, Filed *648 Decision will be entered under Rule 155. Kathleen Hadden, pro se. Monica J. Miller, for the respondent. PARKER, Judge. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1981 in the amount of $ 489,629 and an addition to tax under section 6653(b) in the amount of $ 246,819. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the taxable year in question, and all rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are: 1. Whether petitioner must be deemed to be an accrual basis taxpayer in her illegal drug activity; 2. Whether, on either a cash basis or an accrual basis, petitioner had any taxable income from her illegal drug activity in 1981; and 3. Whether petitioner underpaid her Federal income tax in 1981 and, if so, whether such underpayment of tax was due to fraud within the meaning of section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental *650 stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. Petitioner Kathleen Hadden resided at 391 McCracken Road, Lake Helen, Florida, at the time her petition was filed in this case. Petitioner filed her 1981 Federal income tax return (Form 1040) with the Internal Revenue Service at Orlando, Florida, on November 15, 1982. Petitioner, a high school graduate, continued her education by taking and successfully completing a regular sales course and a broker's course to obtain her real estate license. She became a successful real estate sales person and broker. Petitioner has been buying and selling real estate properties since she was 19 years old. She was employed by her father's firm, the Mitchell Real Estate Company. By the year involved in this case, petitioner had been in the real estate business for approximately 20 years. Up to 1982 her real estate transactions were legitimate, and she reported in income the commissions she earned through the real estate company. Up to 1982 she had also acquired numerous properties and held a substantial portfolio of real estate properties. In 1981 petitioner decided to enter into illegal *651 drug transactions in order to obtain some quick cash. [1] During January or February of 1981, petitioner asked Larry Fitzpatrick, an acquaintance, whether he knew anyone who might be involved in the illegal drug business. Fitzpatrick was in the real estate business, writing a newsletter on real estate in the Florida area, but previously had been involved in drugs. Petitioner was seeking guidance and assistance as well as a possible partner in future drug deals. Fitzpatrick told her that he knew a few individuals and had had some experience with individuals dealing with drugs. Petitioner became *652 acquainted with Charles Burroughs, known as "Big Charlie" or "B.C." (hereinafter referred to as Burroughs), and through Burroughs met Juan Carlos de la Fuente (hereinafter referred to as Carlos). Carlos was a major narcotics trafficker who dealt in marijuana and cocaine. It is not clear whether Fitzpatrick introduced petitioner to Burroughs or whether she introduced Fitzpatrick to Burroughs and Carlos. Burroughs was Carlos' principal assistant or right-hand man. Burroughs' job was to keep track of the illegal drugs (fastidiously referred to in the drug trade as "the product") either owned by Carlos or in which Carlos had some financial interest or responsibility. Burroughs maintained a careful record of the quantity of the product, who had possession of or responsibility for the particular product, and the payments made and the payments still due and owing to Carlos and to himself. Burroughs was the bookkeeper and also the collector for Carlos. To understand the hierarchical, multilayered responsibility for payment for the product, one must understand the system of "fronting" drugs, which will be discussed later. Petitioner had a series of meetings with Burroughs and Carlos *653 both in her home in Lake Helen and in Miami in March/April/May of 1981. Among the topics discussed at the meetings were possible buyers for the drugs, airplanes, and pilots. Petitioner told Carlos that she was in the real estate business and suggested that real estate was an excellent way to launder cash received from the sale of illegal drugs. She also told Carlos that she had contacts and customers who could purchase large quantities of marijuana. However, she herself knew little about the sale and distribution of marijuana, and she did not know anything about the grades or quality of marijuana. After meeting with Carlos and Burroughs, petitioner began to participate in their drug operation. The nature of her participation varied at times and will be discussed in detail below. During 1981, petitioner and Fitzpatrick were actively engaged in the narcotics trafficking business for at least seven months. Petitioner's activity was limited to transactions involving marijuana. She was not involved in the importation and distribution of cocaine during 1981. [2]
*654 In 1981 petitioner "purchased" over 27,000 pounds of marijuana in six separate loads from Carlos. Petitioner "sold" the marijuana for stated "sale prices" in excess of $ 5.8 million. The terms such as "sell," "purchase," and "sales" are used for descriptive purposes only, and are not intended as a legal characterization of the various transactions. [3] *655 The sole source of profit expected by petitioner and Fitzpatrick was that the "sale price" of the marijuana to their customers would be greater than their "purchase price" or cost for the marijuana from Carlos. [4]
Petitioner's "purchases" from Carlos and her "sales" to her customers involved large dollar amounts that can be misleading unless one understands the mechanics of these illegal marijuana transactions. *656 The marijuana was "owned" in part by Carlos, in part by the three brothers (identified only by their first names), and in part by both Carlos and the three brothers. [5] The marijuana was stored in various hiding places, i.e., "stash houses," in North Carolina and Florida. Carlos and/or the three brothers "fronted" the marijuana, meaning that possession of the marijuana was transferred to the customer without receiving the full payment agreed upon. In other words, the product was supplied for a cash down payment, with the balance to be paid later after the customer had sold the product. However, once the product was physically transferred to the customer, i.e., once the customer received physical possession of the product, the customer became responsible for the full purchase price to the owner, regardless of what happened to the product and regardless of whether the customer could sell the product or could collect from his or her own buyers. Frequently, the customer also "fronted" the marijuana to his or her own customers, receiving only part payment in cash, with the balance to be paid later when that customer in turn sold the product and collected from those buyers. At each step *657 of these transactions, the individual expects to sell the product at a price higher than the price he or she has paid or must pay his or her own seller. Thus, there was a multilayered, hierarchical system of responsibility upstream for payment of the full purchase price for the product. For the marijuana owned by Carlos and/or the three brothers, Burroughs usually expected to receive a commission of $ 5 per pound. For some of the marijuana owned solely *658 by the three brothers, both Carlos and Burroughs expected to receive a commission of $ 5 each per pound. In most of the transactions on which petitioner became responsible for the full purchase price to the owner, petitioner simply brought the customer and the agreed-upon down payment to Burroughs and Carlos, but the product was transferred directly from the stash house to the possession of petitioner's customer. Once her customer received physical possession of the product, the customer became responsible to pay petitioner the full price agreed upon between them, and petitioner became responsible to pay Carlos and Burroughs the full price she had agreed to pay the owners. However, even the person who merely introduced a buyer to the owner became secondarily responsible for the payment if that buyer failed to pay the full purchase price to the owner. Burroughs' records indicate that in most instances petitioner was secondarily responsible and in only a few instances was petitioner primarily responsible to the owner for the owner's full purchase price. [6]
*659 During their business relationship with Burroughs and Carlos, petitioner and her partner, Larry Fitzpatrick, "purchased" a minimum of 17 "batches" of marijuana. Subsequently, petitioner and her partner "sold" the marijuana to various customers. Petitioner's records, which were essentially corroborated by Burroughs' ledger, referred to the marijuana transferred to different customers as "loads." Load #1 consisted of eight "batches" of marijuana. Burroughs' records referred to these "batches" by the term "Job." For example, the first 1,632 pounds transferred to Jim and Janet Kaser ("J&J") were listed as "Job 1-A." The batches were also broken down into "bales" that normally weighed from 40 to 50 pounds. However, some bales were packed very tightly ("bricks") and weighed much more than other bales that were packed lightly ("pillows"). None of these terms has any exact meaning or any exact weight or measurement. The only meaningful measure for the marijuana was its weight. Burroughs and others were constantly weighing the product, particularly after some of the product was returned by customers or after there had been a theft from one of the stash houses. "Load #1" consisted of *660 the following "batches" of marijuana: Weight in
Cost to Petitioner &
Sales Price
Pounds Fitzpatrick to Customers
1,632
$ 220/lb     $ 225/lb
2,500
220/lb     230/lb
1,332.25
220/lb     230/lb
915
210/lb     220/lb
292.5
220/lb     225/lb
306
220/lb     225/lb
314.25
220/lb     225/lb
1,023
225/lb     230/lb
Totals:
8,315.00
$ 1,825,265
$ 1,890,576.25
The product for load #1 was stored at a stash house near Lumberton, North Carolina, and was delivered directly to the customers from the stash house in the period of June and July 1981. During June 1981, Burroughs, Carlos, and petitioner met some potential buyers at a motel in Florence, South Carolina, to discuss the sale and distribution of marijuana. Initially, Carlos wanted to call off the purchase and distribution of the first load of marijuana, because there seemed to be a lack of buyers. However, later that month, petitioner and Fitzpatrick drove back to Florence, South Carolina to meet with and introduce Carlos to Jim and Janet *661 Kaser, who were prospective buyers of marijuana. In July 1981, Jim Kaser met with Burroughs and informed him that he had $ 200,000 in cash and wished to purchase some marijuana. Kaser imposed one condition before an actual purchase could occur: he wanted a first-hand look at the marijuana before committing himself to any purchase. Burroughs concurred and thus, prior to the Kasers' actual purchase of the marijuana, Burroughs took the Kasers to the stash house near Lumberton, North Carolina, where the marijuana was stored, which gave them an opportunity to see the product. After both Burroughs and petitioner negotiated with the Kasers, an offer was made and accepted, whereby 1,632 pounds of marijuana were transferred to the Kasers. For the first batch of 1,632 pounds transferred to Jim and Janet Kaser, petitioner, for example, never saw or had possession of the marijuana. Her role was to travel from Florida to the Carolinas, to locate the customers, and to secure the cash down payment from them, $ 200,000 in this instance, which she turned over to Burroughs and Carlos. The $ 220-per-pound cost included $ 215 per pound for Carlos and the three brothers, the owners, and $ 5 per *662 pound commission for Burroughs. The $ 225 per pound was the price petitioner and Fitzpatrick expected the Kasers to pay them. Thus, had the transaction been carried out as anticipated, petitioner and Fitzpatrick would have received $ 5 per pound, for a total of $ 8,160 in connection with the first batch. This $ 5 per pound could be viewed as a commission or finder's fee paid to petitioner and Fitzpatrick for bringing a customer to the owners. Burroughs' record of Job 1-A treats the Kasers as primarily responsible and to the extent that petitioner and Fitzpatrick are secondarily responsible to the owners for the $ 220 per pound, the $ 5 which they hoped to get could also be viewed as a fee for guaranteeing the purchase price to the owner. Following the trip to Florence, South Carolina, petitioner and Fitzpatrick traveled along I-95 to different motels in North Carolina and South Carolina to arrange similar deals. The first four batches of load #1, as listed above, were transferred to the Kasers in similar transactions. The Kasers received a total of 6,379.25 pounds of marijuana. The Kasers did not purchase the marijuana for personal use, but, instead, intended to resell it *663 for a profit. The Kasers also did not pay petitioner all of the money immediately, but only the $ 200,000 down payment mentioned above. One batch of marijuana supposedly transferred to the Kasers was stolen or simply got lost. The Kasers told petitioner that approximately 2,200 pounds of the marijuana they had received from the North Carolina stash house had later been stolen from another stash house in Florida to which they had moved the product. Shortly after the theft of the marijuana, a meeting took place at petitioner's home, with Carlos, Burroughs, petitioner and Fitzpatrick. Since the chain of responsibility for payment for the marijuana passed from Carlos and Burroughs, through petitioner and Larry Fitzpatrick, to the Kasers, Carlos questioned petitioner on how either the Kasers or petitioner and Fitzpatrick were going to pay for the stolen marijuana, especially since petitioner could only give Burroughs approximately $ 26,000 or $ 27,000 of the amount owed for the product. The stolen marijuana was considered the secondary responsibility of both petitioner and Fitzpatrick. Thus, if the Kasers should fail to meet their payment obligations, petitioner and Fitzpatrick *664 were to be held responsible. The balance of monetary responsibility for the stolen marijuana was approximately $ 500,000. Carlos demanded the money from petitioner, and twice attempted to collect the money owed to him by trying to force petitioner to sign over all of her real estate holdings that she had accumulated over the years. [7] In addition, he threatened her life as well as the lives of her family members, bringing gunmen armed with hand guns and a machine gun with a silencer to petitioner's house. Under Carlos' direction, the gunmen proposed to confiscate all of petitioner's possessions and properties, unless other steps were taken to produce the money owed. Later in 1981, around August or September, Carlos again threatened petitioner with force when she failed to meet her payment obligations. *665 Petitioner later came to believe that she was the victim of a setup devised by anonymous person/s to steal the marijuana, thereby keeping petitioner involved in the drug trade and trying to force or coerce her to sell or sign over her real estate properties to pay for her drug debts. After the first stolen-marijuana incident, petitioner felt she had to engage in more narcotics trafficking transactions to pay off the large debt she owed to Carlos. The remaining four batches of marijuana in load #1 were transferred to different drug traffickers. The 1,023-pound batch was transferred to Flip and Phil, while the remaining batches, that is, the 292.5-, 306-, and 314.25-pound batches, were transferred to Joe Kirk and his friends. As in the Kaser transactions, petitioner also was not paid in full for these batches. Similarly to the Kasers' transactions, although other interested buyers had agreed upon a price, petitioner was still responsible to Burroughs and Carlos for the price per pound owed to them. In any event, petitioner's records and Burroughs' ledger indicate that payments for load #1 were partially in cash and partially to be paid at a later date. The table below reflects *666 the cash payments actually made and the outstanding balances owed to petitioner and Fitzpatrick (P/F) and to Carlos and Burroughs (C/B) for load #1. P/F C/B
Owed
$ 1,890,576.25
$ 1,825,265
Paid in cash
1,469,375.00
1,469,180
Bal. outstanding
* 421,396.25
356,085
As the above table shows, all of the cash actually paid for the eight batches of load #1 was turned over to Carlos and Burroughs, except $ 195. Petitioner and Fitzpatrick were still owed $ 421,201.25, and they still owed Carlos and Burroughs $ 356,085. In a similar way, payment for load #2 also became petitioner's responsibility. Load #2 consisted of the following "batches" of marijuana: Weight in
Cost to Petitioner &
Sales Price
Pounds
Fitzpatrick
to Customers
209
$ 125/lb    $ 175/lb   200.5
125/lb    175/lb   224.25
125/lb    175/lb   244.5
125/lb    175/lb   235.25
125/lb    175/lb   5,387
125/lb    175/lb   Totals:
6,500.50
$ 812,562.50
$ 1,137,587.50
*667 From July through September 1981, the 5,387-pound batch was transferred to the Kasers, and Joe Kirk and his friends took the remaining batches of load #2. In this instance, the marijuana belonged to the three brothers and both Carlos and Burroughs were each supposed to receive a commission of $ 5 per pound. The marijuana in load #2 also was stored in part in the North Carolina stash house until it was transferred to the customers found by petitioner and Fitzpatrick. However, the batches of load #2 designated for Joe Kirk and his friends were lost or stolen, or otherwise went astray. Payment for the batches of load #2 was to be made partially in cash and partially at a later date. The table below reflects the cash payments actually made for load #2 and the outstanding balances owed to petitioner and Fitzpatrick (P/F) and to Carlos and Burroughs (C/B): P/F C/B Owed
$ 1,137,587.50
$ 812,562.50
Paid in cash
341,000.00
341,000.00
Bal. outstanding
796,587.50
471,562.50
Again all of the cash collected by petitioner and Fitzpatrick for load #2 was turned over to Carlos and Burroughs and they still owed Carlos and Burroughs $ 471,562.50. *668 After the first two loads of marijuana, petitioner and Fitzpatrick felt that the North Carolina/South Carolina area had been saturated. They attempted to enter the Florida market in August/September 1981. One of the first buyers in the Florida market was Joe Kirk. Petitioner transferred to Joe Kirk loads #3, #4, and #5 during August and September 1981. Loads #3, #4, and #5 consisted of the following "batches" of marijuana: Weight in
Cost to Petitioner &
Sales Price Pounds Fitzpatrick
to Customers
6,254
$ 215/lb $ 225/lb 3,023
215/lb 225/lb 1,366
215/lb 225/lb Totals:
10,643
$ 2,288,245
$ 2,394,675
Sometime after Kirk agreed to purchase the above marijuana, a portion of it was stolen. Subsequently, petitioner informed Burroughs that someone had stolen the marijuana intended for loads #3, #4, and #5 from the "stash house" at Bronson, Florida. Burroughs called Carlos to inform him that more marijuana had been stolen. Thereafter, petitioner and Fitzpatrick met with Burroughs at petitioner's real estate office in Lake Helen, Florida. Many such meetings were held over a period of time to discuss how petitioner and *669 Fitzpatrick were going to pay off their debts for the marijuana. Similar to the payments for the first two loads of marijuana, the payments for the transactions involving loads #3, #4, and #5 were to be made partially in cash and partially to be paid at a later date. The table below reflects the cash payments actually made and the outstanding balances owed to petitioner and Fitzpatrick (P/F) and owed to Carlos and Burroughs (C/B): P/F C/B
Owed
$ 1,407,150.50
$ 1,344,610
Paid in cash
404,000.00
404,000
Bal. outstanding
1,003,150.50
940,610
The above figures relate only to the 6,254-pound batch; the other two batches (3,023 and 1,366 pounds, respectively) were stolen before any payment was ever made, and only partial payment was made on the 6,254-pound batch. Again, all of the cash collected by petitioner and Fitzpatrick was turned over to Carlos and Burroughs, and they still owed Carlos and Burroughs $ 940,610 for the product. In addition to loads #3, #4, and #5, another marijuana transaction involving petitioner and Fitzpatrick occurred on September 5, 1981. Load #6 consisted of the following batch of marijuana: Weight in
Cost to Petitioner &
Sales Price
Pounds Fitzpatrick
to Customers
1,790.75 pounds
$ 215/lb
$ 225/lb
*670 The product was transferred to petitioner and her partner from a stash house in Miami, Florida. The marijuana was owned by the three brothers and both Carlos and Burroughs were supposed to receive a commission of $ 5 per pound each. The brothers were to receive $ 205 per pound. This is the only load of marijuana as to which petitioner and Fitzpatrick had primary responsibility for payment. Payment for load #6 was to be partially in cash and partially to be paid at a later date. The table below reflects the cash payments actually made and the outstanding balances owed to petitioner and Fitzpatrick (P/F) and to Carlos and Burroughs (C/B): P/F C/B
Owed
$ 402,918.75
$ 385,011.25
Paid in cash
376,500.00
376,500.00
Bal. outstanding
26,418.75
8,511.25
Again, all of the above cash collected by petitioner and Fitzpatrick was turned over to Carlos and Burroughs, and they still owed Carlos and Burroughs $ 8,511.25 for the product. On November 1, 1981, petitioner and Fitzpatrick met with Carlos and Burroughs at the "Gold Key Inn," in Orlando, Florida to discuss the marijuana transactions, including load #6, identified in Burroughs' ledger as *671 "Job #6DD." The subject of the discussion among the parties was the continuing debt of petitioner and Fitzpatrick. The parties had agreed a few days earlier, on October 29, 1981, that petitioner had a debt balance of $ 66,640.63 and Fitzpatrick had a debt balance of $ 50,278.12, for a total of $ 116,918.75 owed to Carlos. This debt was a primary responsibility arising out of load #6. That debt included only amounts still due and owing at that time for product transferred directly to them and did not include other debt for which they were secondarily responsible for product transferred to others. In addition, petitioner had a remaining debt balance of $ 831,220 to Carlos for the Kasers' various purchases. Petitioner had turned over to Carlos almost $ 2 million in cash payments by November 1, 1981. Subsequently, petitioner made additional payments of $ 15,000 on November 17, 1981, and $ 30,000 on November 25, 1981. After these payments, petitioner was still responsible to Carlos for not only the Kasers' debt of $ 831,220, but also $ 1,300 still owed by Flip and Phil, and the balance of $ 21,640.63 still owed on the $ 66,640.63 for load #6. Thus, at the end of November 1981, *672 petitioner still owed directly or indirectly at least $ 854,160.63 to Carlos. At some point Carlos added a $ 5,000 penalty for late payment of these debts. Another debt of $ 31,720 brought the total of petitioner's debt for the marijuana up to $ 890,880.63 by late November of 1981. Sometime in late November or early December 1981, the Kasers returned to petitioner an unsold portion of a batch they had received from load #2, the batch of 5,387 pounds. They returned the product because of its poor quality and lack of marketability. The Kasers returned the unsold portion, amounting to approximately 4,100 pounds, to petitioner's home in Lake Helen. As far as the record discloses, this was the only marijuana that petitioner ever had physical possession of. Soon thereafter, in late November or early December 1981, petitioner met with Carlos, Burroughs, and Fitzpatrick to discuss not only each of the instances of stolen marijuana, but also how petitioner was to pay them the money she owed. Since petitioner could not pay Carlos in cash, he demanded that she sign over to him all of the property deeds to her real estate properties. Carlos wanted her to assign to him all of her property *673 deeds, homes, trailers, and also the property that Jim and Janet Kaser owned. In addition, he wanted whatever goods or value of services he could acquire from her. He also wanted to know the amounts of any mortgages and the taxes owed on each property, which amounts he proposed to add to the balance that petitioner already owed, less whatever would be realized from the liquidation of these assets. Petitioner agreed to pledge her real estate holdings to Carlos to pay off her outstanding debts. She compiled a list of various properties that she owned throughout Florida and other States. While there was a lot of discussion about signing over the properties and a lot of unsigned deeds passed around, the record does not show that petitioner ever in fact transferred any of her properties to Carlos. [8] In 1981 and 1982 petitioner kept various unsigned property deeds to various real estate properties she owned. Many of the apparent purchases and sales of her properties in 1981 and 1982 were simply subterfuges designed to keep her properties out of Carlos' hands, a successful ploy. Her properties were later seized by the Internal Revenue Service in a jeopardy assessment proceeding. *674 In all of the preceding marijuana transactions, petitioner had not made any money and had instead gotten steadily more indebted to Carlos and Burroughs. Even where Carlos did not own the product, i.e., that belonging to the three brothers, Carlos (and possibly even Burroughs) was responsible for the full purchase price to the owners and each person at every level below, who either took physical possession of the product or who even introduced or arranged for a buyer for the product, remained directly or indirectly responsible for the full price owed to the owners. In a sense it was like a Ponzi scheme with each person's "profit" being dependent on finding a buyer or buyers to take the product at an ever increasing price, presumably ultimately down to the street level and the ultimate user. With the various *675 thefts of the product from the various stash houses and with the difficulty in selling much of the product because of its inferior quality, petitioner did not fully pay for the product and in that sense still owed for part of her "cost of goods sold" and had no gross or net income from her fling as a drug trafficker. However, at some point she skimmed some $ 120,000 of the cash payments she collected and never turned that money over to Carlos or Burroughs. When confronted by Carlos about $ 120,000 in "missing money," petitioner admitted she had taken the money, had expected to return the money, but had not been able to do so. Petitioner did not repay the $ 120,000 in 1981, and the record does not indicate that she ever repaid that amount. By mid-December 1981, petitioner's debt had not been paid and Carlos was pressing her for payment. To raise money, petitioner decided to try to sell the marijuana returned to her by the Kasers. She, her son, and another man rented a truck and took the product to Wisconsin. On December 21, 1981, petitioner and her son, John T. Hadden, and a John J. Whitehall were arrested. She was charged with possession of marijuana with the intent to distribute. *676 Petitioner was indicted in the United States District Court for the Eastern District of Wisconsin. She pleaded guilty to possession with the intent to distribute marijuana in violation of Title 21 USC section 841, and Title 18 USC section 2. She was sentenced to imprisonment for two and one-half years and served the time. At the time of her arrest, the legal authorities seized more than 3,200 pounds of marijuana in the possession of petitioner and the other two individuals. The authorities also seized a trash compactor, a floor scale, packaging material, drug records and documents, and $ 2,827 in cash. In addition, certain records were found in petitioner's briefcase and purse. Petitioner's briefcase and purse contained records and documents detailing the drug transactions which have been discussed above. When Burroughs was arrested in 1982, he cooperated with the authorities, and his ledger corroborated petitioner's records. However, Burroughs' ledger was more detailed as to who owned the various loads and batches of marijuana and as to any commissions owed to Carlos and to himself. Burroughs' ledger set out more clearly the direct *677 and indirect (primary or secondary) responsibility for the various transactions. Although the quantities of marijuana were variously described as loads, batches, bales, or jobs, the determinative measure was solely weight, and all sale or purchase prices were in terms of so many dollars per pound. Keeping track of the product was very difficult because of the necessary secrecy and surreptitious nature of the transactions, and because of the numerous thefts ("rip offs") and disappearances of the product. Burroughs, Fitzpatrick, and others were frequently directed by Carlos to weigh the product at the various stash houses, particularly upon physical delivery of marijuana or after "a major rip off." On her 1981 Federal income tax return, petitioner did not report any income from the distribution and sale of marijuana. Her return was prepared by her accountant, Arlis G. Bell, on the basis of information provided by petitioner. On that return petitioner reported interest income, capital gain, and a Schedule C real estate business loss, for total adjusted gross income of $ 44,490. Petitioner did not report any income in 1981 from her illegal drug activities. She did not tell her *678 return preparer that she was engaged in any illegal drug transactions. During the audit, petitioner tried to mislead the Internal Revenue Service agent by insisting that the only drug transaction she was involved in was the one in Wisconsin resulting in her arrest. She also denied that the records and documents found in her briefcase and purse belonged to her. Petitioner did not file tax returns for 1982, 1983, or 1984. Respondent determined petitioner's taxable income from the marijuana transactions. Respondent treated petitioner as an accrual basis taxpayer, apparently treating (a) her prices to her customers (pounds times price per pound) as her gross receipts, apparently treating (b) her purchase price from Carlos (or other owners) as her cost of goods sold, and apparently treating (c) her gross income ((a)-(b)=(c)) as net taxable income from the distribution and sale of marijuana. [9] *679 Respondent also determined that petitioner had commission income of $ 157,258 from her illegal drug activities in 1981. [10] Respondent also determined a fraud addition under section 6653(b). Respondent thus issued a notice of deficiency determining a deficiency of $ 489,629 and a fraud addition of $ 246,819. [11]
ULTIMATE FINDINGS OF FACT 1. Petitioner had unreported taxable income in the amount of $ 120,000 from her illegal drug activities in 1981. 2. Petitioner underpaid her Federal income tax in 1981 and that underpayment was due to fraud within the meaning of section 6653(b). OPINION This fraud case might well be called the case of the would-be illegal drug trafficker who fell among thieves. Admittedly lured by a desire for a lot of quick and supposedly easy money, petitioner in 1981 became involved in the illegal drug activities of one Juan Carlos de la Fuente (hereinafter Carlos), a known major narcotics trafficker. *680 In a period of a few months some two million dollars passed through her hands to Carlos, but by early December of 1981 she was indebted to Carlos for over $ 800,000. Before Christmas of 1981, she was arrested, and charged with possession of marijuana with intent to distribute. She subsequently pleaded guilty and served a prison sentence. While the Court has little doubt that petitioner did not intend to share her hoped-for drug wealth with the tax gatherer, nevertheless the first question in this civil tax case is whether she had any unreported taxable income from her illegal drug activities. As will be discussed below, we conclude that other than the $ 120,000 she skimmed, petitioner did not in fact make any money from the marijuana transactions. Respondent of course treats the various transactions as sales by the "owners" of the marijuana to petitioner and Fitzpatrick and then resales by them to the Kasers and others. As respondent views the facts, if all of the sales and collections for load #1 had been accomplished as anticipated, petitioner and Fitzpatrick theoretically would have received from load #1 gross receipts of $ 1,890,576.25, would have incurred costs of goods *681 sold of $ 1,825,265, and would have received gross income of $ 65,311.25. Respondent treats this theoretical gross income of $ 65,311.25 as net profit and net taxable income to petitioner and Fitzpatrick in 1981. Respondent treats as net income the gross amount petitioner and Fitzpatrick expected to receive but did not in fact receive. Respondent achieves that result by placing petitioner on the accrual basis of accounting. As stipulated by the parties and as shown by petitioner's testimony, which the Court believed, the facts are that all of the cash (other than the $ 120,000) collected from the buyers was turned over to Carlos, and petitioner still owed him over $ 800,000 for "the product," much of which had been stolen, seized by the legal authorities, or otherwise gone astray before the end of the year. In a practical sense, petitioner had not even paid for her cost of goods sold. Respondent imputes income to petitioner by placing her on the accrual basis of accounting. Respondent's position is that petitioner's illegal drug business was required to use the accrual method of accounting and that under the accrual method of accounting petitioner had income of $ 257,336.88 *682 in 1981 from her illegal drug activities. Respondent argues that petitioner is compelled to use the accrual method of accounting for three reasons. First, respondent says, she kept her books and records on the accrual basis and thus must use the same method for tax accounting. Sec. 446(a). Petitioner did make an effort to keep track of what she expected to collect from the persons to whom the marijuana was transferred and what she was to pay over to Carlos. However, to argue, as respondent does, that petitioner "maintained inventories, credited accounts receivable in full when the receivable arose and debited accounts payable in full upon incurring the obligations" does not comport with the realities of this case. While petitioner's notebook notations were consistent with, and to that extent corroborated by Burroughs' ledger, it was Burroughs' careful ledger on which the parties to this case and the Court relied to reconstruct the various drug transactions. Burroughs was the bookkeeper for Carlos' illegal drug business. His ledger recorded the number of pounds of product transferred to the various individuals, the payments made, and the payments still due and owing. Also Burroughs' *683 ledger indicated who was primarily responsible for payment for the product. On the other hand, to equate petitioner's cryptic notations in her notebooks with the use of an accrual method of accounting is, in the Court's view, to indulge in fantasy. Secondly, respondent says, petitioner was required to use inventories and did use inventories, and the use of inventories was necessary in order clearly to determine her income. Secs. 446(b), 471(a); sec. 1.446-1(c)(2)(i), Income Tax Regs. Again, we disagree. As relevant, section 1.471-1, Income Tax Regs., requires a taxpayer to use inventories where the sale of merchandise is an income-producing factor. Section 1.471-1 provides, further, that merchandise should only be included in inventory if title thereto is vested in the taxpayer. Section 1.446-1(c)(2)(i), Income Tax Regs., requires taxpayers using inventories to compute their income pursuant to the accrual method. Petitioner was not required to use inventories and, in fact, did not use inventories. We think *684 petitioner's activities were not so much sale of a product as the performance of services. The marijuana remained in Carlos' various stash houses until it was transferred to the various purchasers. Petitioner never had "title" to or physical possession of any of the product, except possibly load #6 (Job #6DD) and the unsold portion of one load that the Kasers could not sell and returned to her at her home. She did not become responsible to Carlos for payment for the product, either primarily or secondarily, until the product was physically delivered from Carlos' stash house into the possession of the purchasers. Petitioner correctly pointed out that she and Fitzpatrick were acting essentially as "middlemen" for Carlos. Moreover, respondent's insistence that petitioner must use inventories to clearly determine her income or to reflect her taxable income correctly does not serve that purpose. Respondent's argument serves only to try to create income to petitioner where none in fact existed. [12]
*685 Thirdly, respondent argues, the Commissioner, in the deficiency notice, has determined that the use of the accrual method of accounting was required to clearly reflect petitioner's income under section 446(b) and that petitioner must show that the Commissioner abused his discretion in so doing. Commissioner v. Hansen, 360 U.S. 446, 467 (1959); Primo Pants Co. v. Commissioner, 78 T.C. 705, 719-720 (1982). We do not read the deficiency notice as a determination that petitioner must use the accrual method of accounting, but if we did, we would have little trouble on the facts of this case in concluding that there was such an abuse of discretion. We do not question that, in a proper case, the Commissioner may require a drug dealer to use the accrual method of accounting in order to clearly reflect his or her income. We merely hold that, on the facts of this case, petitioner did not maintain books and records on an accrual basis, did not maintain inventories of marijuana, and should not be deemed to have income that she did not in fact receive and which *686 as of the end of 1981 there was little or no likelihood that she would ever receive. Of course, actual receipt of income is not required under the principles of normal accrual accounting. Section 1.446-1(c)(1)(ii), Income Tax Regs., provides generally that under an accrual method "income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." On the facts here, the Court finds difficulties with both prongs of the "all events" test for accruability. Under the system of "fronting" the marijuana in this case and even under Carlos' practice of trying to hold everyone connected with the transaction responsible for the payment owed to him and the other "owners," in most instances petitioner and Fitzpatrick were only secondarily responsible. In this illegal drug milieu, Carlos regarded even the person who introduced a prospective purchaser as responsible if that customer failed to pay him. What petitioner hoped to obtain from the transaction *687 was not so much a net profit from a sale of a product but something more akin to a commission such as Burroughs expected to receive, a finder's fee, or a fee for her services in locating a purchaser for Carlos. Apart from metaphysical efforts to accurately characterize the exact nature of drug transactions and petitioner's exact role in them, the fact remains that Carlos had not yet been paid what he expected to receive on the deals, and until Carlos was paid it is difficult to say that all events had occurred to fix petitioner's right to receive any income. And there is no basis on which to determine the amount, if any, that she would ever receive. Nonetheless, assuming for the sake of argument that the "all events test" has been satisfied on these facts, accrued income should not be reported if it is currently uncollectible and there is no reasonable expectation that the taxpayer will ever collect it. Great Northern Railway Co. v. Commissioner, 8 B.T.A. 225, 265-270 (1927), affd. on other issues 40 F.2d 372 (8th Cir. 1930), cert. denied 282 U.S. 855 (1930). *688 Cf. Mooney Aircraft, Inc. v. United States, 420 F.2d 400, 409-410 (5th Cir. 1969) (deductions for accrued expenses disallowed where length of time between incurrence of obligation and ultimate payment greatly reduced the likelihood that the taxpayer would ever pay the "expense"). Carlos tried to enforce the responsibility for payment, either the primary responsibility of the Kasers, for example, or the secondary responsibility of petitioner and Fitzpatrick, by threats and gunmen. However, even Carlos himself was unsuccessful in his collection efforts. At one point when Carlos was threatening the lives of the Kasers, petitioner, and Kirk, Burroughs reminded Carlos that "dead people don't pay bills." Nonetheless Carlos did not get paid in full for the transactions in which petitioner and Fitzpatrick were involved. At the end of 1981 Carlos was still owed over $ 1.77 million for marijuana that was "on the street." Before the end of 1981 petitioner had been arrested; much of the marijuana for which she was primarily or secondarily responsible had been stolen, seized by the legal authorities, or otherwise gone astray. It is highly unlikely that she would get paid *689 before Carlos got paid. It was highly unlikely at the end of 1981 that anyone was going to get paid for the marijuana that was on the street. The situation was such that even assuming that all the events had occurred which fixed petitioner's right to receive the income, such "income" should not be accrued because it was highly improbable that petitioner would ever receive such income. There is precedent for this result in those cases where rental income or interest income, otherwise accruable under that accounting method, is not accrued where there exists at the time payment becomes due a reasonable doubt that the rent will ever be paid or that the interest will ever be paid. Marguerite Hyde Suffolk & Berks v. Commissioner, 40 B.T.A. 1121, 1132-1135 (1939); Great Northern Railway Co. v. Commissioner, supra.
Thus, on the peculiar facts of this case, we conclude that even under the accrual method of accounting, the "income" should not be accrued here. The income was not collectible in 1981 and there was little or no likelihood of collection in the future. However, we reach a different result as to the $ 120,000. Petitioner skimmed this *690 money from the payments she collected for Carlos in 1981. Petitioner actually received this money in 1981 and did not repay it that year. It is well established that illegal gain is taxable. James v. United States, 366 U.S. 213, 219 (1961); Rutkin v. United States, 343 U.S. 130, 137 (1952); sec. 1.61-14(a), Income Tax Regs. Petitioner failed to report the $ 120,000 on her tax return and accordingly understated her taxable income by that amount and underpaid her taxes in 1981. The final issue is whether or not petitioner is liable for the addition to tax under section 6653(b) for fraud. Respondent has the burden of proof and must prove by clear and convincing evidence that (1) there was an underpayment of tax and (2) that the underpayment was due to fraud. Korecky v. Commissioner, 781 F.2d 1566 (11th Cir. 1986), affg. a Memorandum Opinion of this Court; sec. 7454(a); Rule 142(b). There can be little doubt that petitioner *691 underpaid her taxes by omitting $ 120,000 in taxable income from her return. The remaining question is whether this underpayment was due to fraud. The fraud envisioned by section 6653(b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Korecky v. Commissioner, supra, 781 F.2d at 1568; Candela v. United States, 635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of the taxes. Korecky v. Commissioner, supra; Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Fraud is never presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud is a question of fact to be determined on the basis of the entire record. Since fraud can *692 seldom be proved by direct proof of the taxpayer's intention, fraud therefore must be determined from the taxpayer's entire course of conduct and can, and usually must, be proved by circumstantial evidence. Spies v. United States, 317 U.S. 492 (1943); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Korecky v. Commissioner, supra.This and other courts frequently list various factors or "badges of fraud," which are the various types of circumstantial evidence from which fraudulent intent can be inferred. Bradford v. Commissioner, supra; Meier v. Commissioner, 91 T.C. 273, 297-298 (1988). The fact finder must weigh all of the evidence in the record and cannot simply note the presence or absence of the various possible kinds of circumstantial evidence. Based on the record as a whole, as detailed in our Findings of Fact above, we conclude that respondent has proved fraud by clear and convincing evidence. Before petitioner decided to take her fling into illegal drug trafficking, she had long been a successful real estate salesperson *693 and broker. She had amassed a substantial number of real estate properties, and was experienced in business matters. When petitioner omitted $ 120,000 from her return, she knew her taxes would be underpaid. As noted earlier, the Court is wholly satisfied that if petitioner's drug trafficking activities had proved as profitable as she hoped when she headed down that illegal path, she did not intend to report any such illegal gains on her tax return. In fact, even after her arrest, she tried to mislead the Internal Revenue Service during the audit, suggesting that that one transaction in Wisconsin that brought about her arrest was her only drug deal. She also denied that the records and documents found in her briefcase and purse at the time of her arrest belonged to her. She did not tell her accountant who prepared her 1981 tax return that she had been involved in the drug business that year. She also did not tell her accountant that she had skimmed ("stolen") $ 120,000 of the money that belonged to Carlos. As we stated in McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), a case in which the taxpayer swindled *694 and defrauded his employer: it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax.
* * * Here petitioner concealed and misrepresented the facts about this $ 120,000 that she skimmed from Carlos' receipts. [13] The Court concludes on the record as a whole that petitioner underpaid her taxes in 1981 and that the underpayment was due to fraud with the intent to evade taxes. *695 To reflect the above holdings, Decision will be entered under Rule 155. Footnotes
1. While petitioner alluded to the need to pay for her father's colon cancer treatment, there is no indication that either she or her father was pressed for money for medical expenses. Petitioner principally wanted to get her father's estate "in order" before he died, and she apparently thought she needed a lot of money for that purpose. Her father's real estate business is now owned by her son, John T. Hadden.↩
2. Any transactions involving cocaine occurred in 1982, a year not before the Court.↩
3. Petitioner appeared pro se and without legal counsel at the trial of this case. She agreed to stipulations that can be read as broad legal conclusions. She stipulated, for example, that she was "a narcotics trafficker in 1981 engaged in the business of the distribution and sale of marijuana" and that "Burroughs supplied petitioner with marijuana which petitioner and Larry Fitzpatrick sold to various customers." However, in other instances where respondent tried to get petitioner to stipulate to purchases of marijuana from petitioner and Fitzpatrick, petitioner insisted that the marijuana was "transferred," not sold. The Court accepts the stipulations as showing that petitioner was engaged in illegal marijuana transactions in 1981, but does not regard the stipulation as binding to the extent they purport to draw legal conclusions as to the nature of these transactions. These conclusory stipulations fail to reflect how these transactions were in fact carried out and fail to reflect petitioner's actual role in these transactions.↩
4. The parties stipulated that petitioner earned no "commission income" from the sale of marijuana in 1981. The Court accepts this stipulation as a concession by respondent that petitioner did not receive the $ 157,258 in commissions determined in the statutory notice of deficiency. In other words, respondent now agrees that any unreported income from the marijuana transactions is confined to the difference between her "purchase price" (cost) from Carlos and her "sale price" to her customers, the alleged net profit on sales of marijuana, i.e., the amount of $ 568,118 determined in the deficiency notice, which amount, respondent now agrees, does not exceed $ 300,000. However, the Court does not regard this stipulation as binding to the extent that it purports to be a legal characterization of the nature of any income petitioner may have realized in connection with her illegal drug activity.↩
5. With illegal merchandise such as marijuana, it is of course difficult to describe the transaction in normal commercial sales terms such as passage of title or the assumption of the benefits and burdens of ownership. If the customer "breaches" a "contract" to pay for marijuana, the "owner" can hardly bring a law suit to enforce the agreement. Enforcement in this case involved bringing in gunmen with hand guns and machine guns who threatened the individual and threatened his or her family. This enforcement option was not practicably available to petitioner.↩
6. We think these fine distinctions do not change the fact that petitioner was a narcotics trafficker in 1981 engaged in the business of the distribution and sale of marijuana. See n.3, supra↩. However, these facts as to the actual mechanics of these transactions are relevant in regard to respondent's attempt to put petitioner on an accrual basis of accounting and in determining the amount of any taxable income petitioner realized.
7. Responding to Carlos' demands, petitioner listed ten separate real estate properties (1-10), whose total fair market value was $ 246,500. However, the properties were heavily mortgaged, and petitioner's equity therein amounted to only some $ 58,102. Despite the threats, petitioner never signed over her properties to Carlos.↩
*. This is the figure stipulated by the parties, but it would appear that the balance is $ 421,201.25.↩
8. In 1982, however, petitioner engaged in a lot of real estate transactions for Carlos, helping him to acquire various properties the deeds for which he placed in the names of his various family members.↩
9. Respondent determined net profit from seven "loads" of marijuana as follows: Weight Net Profit
Load No.
pounds
per pound
per load
1 8,315.00
$ 10
$ 83,150
2 6,500.50
50
325,025
3 6,254.00
10
62,540
4 3,023.00
10
30,230
5 1,366.00
10
13,660
6 2,343.85
19
44,533
7 898.00
10
8,980
28,700.35
Total Net Profit:
$ 568,118
At trial respondent conceded that petitioner's unreported income (net profit) from the drug transactions did not exceed $ 300,000. Respondent in his brief now claims unreported net profit of $ 257,336.88.↩
10. Respondent has now conceded the item of commission income (n.4, supra↩).
11. These amounts have already been assessed as a result of a jeopardy assessment proceeding.↩
12. The Court was initially skeptical when petitioner testified that she got none of the large sums of money generated by these drug deals. However, the Court has reviewed the entire record, including the several volumes of transcript of Carlos' criminal trial, in which petitioner was neither a witness nor a defendant, but which the parties stipulated into evidence as if the testimony of Burroughs, Fitzpatrick, and others was given in this proceeding. The Court's review of the record as a whole plus the opportunity to question petitioner and to observe her demeanor on the stand convince the Court that she was telling the truth in this regard.↩
13. Petitioner denied at the trial that she kept this money, but the Court did not believe her on this particular point. Burroughs' detailed testimony about the "missing money" was more persuasive, and was more consistent with the totality of facts and circumstances surrounding the entire illegal drug operation at that point in late 1981.↩